# No. 25-50518

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Julio Del Rio, individually and on behalf of all others similarly situated; Jack Murphy, individually and on behalf of all others similarly situated; Steven Bixby, individually and on behalf of all others similarly situated; Christopher Harlan; Sara Harlan; Philip Kirby; Jennie Aguayo; Alicia Kirby,

Plaintiffs – Appellants

v.

CrowdStrike, Incorporated; CrowdStrike Holdings, Incorporated,

Defendants – Appellees

*On Appeal from the United States District Court for the Western District of Texas, Austin Division, No. 1:24-cv-00881-RP, Hon. Robert Pitman*

## BRIEF OF APPELLANTS

Ben Barnow
BARNOW AND ASSOCIATES, P.C.
205 West Randolph Street, Suite 1630
Chicago, Illinois 60606
Tel: 312.621.2000

Cory S. Fein
CORY FEIN LAW FIRM
13105 Northwest Fwy., Suite 705
Houston, Texas 77040
Tel: 713.730.5001

Robert K. Shelquist
CUNEO GILBERT & LADUCA, LLP
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Tel: 612.254.7288

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

The interested persons are as follows:

- Plaintiffs-Appellants: Julio del Rio, Jack Murphy, Steven Bixby, Alicia Kirby, Philip Kirby, Jennie Aguayo, Christopher Harlan, and Sara Harlan

- Counsel for Plaintiffs-Appellants: Ben Barnow of Barnow and Associates, P.C., Cory S. Fein of Cory Fein Law Firm, and Robert K. Shelquist of Cuneo Gilbert & LaDuca, LLP

- Defendants-Appellees: CrowdStrike, Inc. and CrowdStrike Holdings, Inc.

- Counsel for Defendants-Appellees: Isabelle Ord, Jeffrey DeGroot, Samantha Chaifetz, Mallory Biblo, and John M. Guaragna of DLA Piper LLP (US)

/s/ Ben Barnow
Ben Barnow
BARNOW AND ASSOCIATES, P.C.
205 West Randolph Street, Suite 1630
Chicago, Illinois 60606
Tel: 312.621.2000

*Counsel for Plaintiffs-Appellants*

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This litigation raises important issues concerning the limits of preemption under the Airline Deregulation Act of 1978 as applied to claims against a third-party vendor of cybersecurity software to airlines. Due to the technical nature of the underlying facts, which center on defects in cybersecurity software, and the complex statutory analysis required to resolve the issues raised in this appeal, Plaintiffs-Appellants believe oral argument will aid the Court in fully understanding the allegations and claims at issue and evaluating the proper scope of preemption.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ...................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities ............................................................................... iv

Introduction ..............................................................................................1

Jurisdictional Statement ...........................................................................2

Issues Presented for Review .....................................................................3

Statement of the Case ...............................................................................3

   I.   Factual Background ...........................................................................3

      A.   CrowdStrike and the Falcon Cybersecurity Software..............................3

      B.   CrowdStrike Negligently Developed and Released Defective Software .5

      C.   The CrowdStrike Outage.........................................................................9

   II.  Procedural History ..........................................................................10

Summary of the Argument.......................................................................12

Argument..................................................................................................13

   I.   Standard of Review ..........................................................................13

   II.  The District Court Erred by Holding the ADA
       Preempts Plaintiffs' Claims ..........................................................14

      A.   Legal Standard for ADA Preemption.....................................................14

      B.   Plaintiffs' Claims Do Not Relate to Airline Services .............................16

      C.   Plaintiffs' Claims Do Not Have a Forbidden
          Significant Effect on Airline Services ....................................................23

      D.   The District Court Erred by Considering Whether Hypothetical
          Claims Against Non-Party Airlines Would be Preempted .....................39

Conclusion ...............................................................................................43

Certificate of Service ...............................................................................45

Certificate of Compliance ........................................................................45

## TABLE OF AUTHORITIES

## Cases

*A.C.L. Computs. & Software, Inc. v. Fed. Express Corp.*,
  No. 15-cv-04202-HSG,
  2016 U.S. Dist. LEXIS 29001 (N.D. Cal. Mar. 4, 2016) ...................................35

*Air Evac EMS, Inc. v. Sullivan*,
  8 F.4th 346 (5th Cir. 2021) ...................................................................16

*Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*,
  851 F.3d 507 (5th Cir. 2017) ................................................................13

*Am. Airlines, Inc. v. Wolens*,
  513 U.S. 219, 115 S. Ct. 817 (1995) ....................................................16

*Bajra v. Delta Air Lines, Inc.*,
  No. 1:24-CV-3477-MHC,
  2025 U.S. Dist. LEXIS 107473 (N.D. Ga. May 6, 2025) ........................... 21, 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ...................................................14

*Bower v. EgyptAir Airlines Co.*,
  731 F.3d 85 (1st Cir. 2013) ...................................................... 23, 27, 36

*Branche v. Airtran Airways, Inc.*,
  342 F.3d 1248 (11th Cir. 2003) ...................................... 15, 18, 19, 38

*Butcher v. City of Houston*,
  813 F. Supp. 515 (S.D. Tex. 1993) ......................................................27

*Charas v. TWA*,
  160 F.3d 1259 (9th Cir. 1998) ...................................................... 26, 29

*Cleveland v. Piper Aircraft Corp.*,
  985 F.2d 1438 (10th Cir. 1993) ...........................................................30

*Codoni v. Port of Seattle*,
No. 2:23-cv-795-JNW,
2024 U.S. Dist. LEXIS 214318 (W.D. Wash. Nov. 25, 2024)...........................22

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251, 133 S. Ct. 1769 (2013)........................................................ 15, 16

*Day v. SkyWest Airlines*,
45 F.4th 1181 (10th Cir. 2022) .................................................... passim

*DiFiore v. Am. Airlines, Inc.*,
646 F.3d 81 (1st Cir. 2011).................................................................38

*Emmett v. Delta Air Lines, Inc.*,
No. 2:22-1568,
2024 U.S. Dist. LEXIS 97812 (W.D. Pa. June 3, 2024) ...................................36

*Ezell v. Kan. City S. Ry. Co.*,
866 F.3d 294 (5th Cir. 2017) ...............................................................14

*Fenn v. Am. Airlines, Inc.*,
839 F. Supp. 1218 (S.D. Miss. 1993) ....................................................26

*Franks Inv. Co. LLC v. Union Pac. R.R. Co.*,
593 F.3d 404 (5th Cir. 2010) ..............................................................14

*Garrett v. Lumpkin*,
96 F.4th 896 (5th Cir. 2024) ...............................................................42

*Gill v. JetBlue Airways Corp.*,
836 F. Supp. 2d 33 (D. Mass. 2011)....................................................29

*Guevara v. Castro*,
139 F.4th 422 (5th Cir. 2025) .............................................................43

*Harris v. Forklift Sys.*,
510 U.S. 17, 114 S. Ct. 367 (1993).......................................................42

*Hernandez v. W. Tex. Treasures Estate Sales, LLC*,
79 F.4th 464 (5th Cir. 2023) ........................................................ 14, 37

v

*Hodges v. Delta Airlines, Inc.*,
  44 F.3d 334 (5th Cir. 1995) ........................................................ passim

*In re Am. Airlines, Inc., Priv. Litig.*,
  370 F. Supp. 2d 552 (N.D. Tex. 2005) .............................................20

*In re Chamber of Commerce of United States*,
  105 F.4th 297 (5th Cir. 2024) .........................................................42

*In re Katrina Canal Breaches Litig.*,
  495 F.3d 191 (5th Cir. 2007) ...........................................................14

*In re Whitaker Constr. Co.*,
  411 F.3d 197 (5th Cir. 2005) ...........................................................24

*Klick v. Cenikor Found.*,
  94 F.4th 362 (5th Cir. 2023) ...........................................................42

*Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*,
  283 F.3d 282 (5th Cir. 2002) ...................................................... 15, 40

*Margolis v. United Airlines, Inc.*,
  811 F. Supp. 318 (E.D. Mich. 1993) .................................................29

*Morales v. TWA*,
  504 U.S. 374, 112 S. Ct. 2031 (1992).......................................... passim

*Nw., Inc. v. Ginsberg*,
  572 U.S. 273, 134 S. Ct. 1422 (2014).................................................40

*Onoh v. Nw. Airlines, Inc.*,
  613 F.3d 596 (5th Cir. 2010) ...........................................................40

*Pica v. Delta Air Lines, Inc.*,
  No. CV 18-2876-MWF (Ex),
  2019 U.S. Dist. LEXIS 65985 (C.D. Cal. Feb. 14, 2019) .................20

*Pittman by Pittman v. Grayson*,
  869 F. Supp. 1065 (S.D.N.Y. 1994) .................................................29

*Pub. Health Tr. v. Lake Aircraft, Inc.*,
   992 F.2d 291 (11th Cir. 1993) ............................................................30

*Rombom v. United Air Lines*,
   867 F. Supp. 214 (S.D.N.Y. 1994) .....................................................42

*Rowe v. N.H. Motor Transp. Ass'n*,
   552 U.S. 364, 128 S. Ct. 989 (2008)..................................... 23, 25, 35

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*,
   697 F.3d 544 (7th Cir. 2012) .............................................................38

*Smith v. Am. W. Airlines*,
   44 F.3d 344 (5th Cir. 1995) ................................................. 18, 40, 41

*Smith v. Comair, Inc.*,
   134 F.3d 254 (4th Cir. 1998) .............................................................40

*Taj Mahal Travel v. Delta Airlines*,
   164 F.3d 186 (3d Cir. 1998) ................................................ 24, 25, 28

*Test Masters Educ. Servs. v. Singh*,
   428 F.3d 559 (5th Cir. 2005) .............................................................14

*Tobin v. Fed. Express Corp.*,
   775 F.3d 448 (1st Cir. 2014)..................................................... passim

*Travel All Over the World v. Kingdom of Saudi Arabia*,
   73 F.3d 1423 (7th Cir. 1996) ...................................................... 40, 41

*Umbrella Inv. Grp. v. Wolters Kluwer Fin. Servs.*,
   972 F.3d 710 (5th Cir. 2020) ...............................................................3

*United States v. Lauderdale Cnty.*,
   914 F.3d 960 (5th Cir. 2019) .............................................................29

*Waggoner v. Gonzales*,
   488 F.3d 632 (5th Cir. 2007) .............................................................29

*Watson v. Air Methods Corp.*,
   870 F.3d 812 (8th Cir. 2017) ...................................................... 39, 40

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ................................................................14

**Statutes**

28 U.S.C. § 1291 .............................................................................................2

28 U.S.C. § 1404 ...........................................................................................42

49 U.S.C. § 40101 ................................................................................... 14, 25

49 U.S.C. § 41112 .........................................................................................28

49 U.S.C. § 41713 .......................................................................................3, 15

Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 ...................14

**INTRODUCTION**

This litigation addresses one of the most significant global technology failures in modern history. On July 19, 2024, Defendants-Appellees CrowdStrike, Inc. and CrowdStrike Holdings, Inc. (together, "CrowdStrike") released a defective update for their Falcon cybersecurity software platform ("Falcon") which rendered more than 8.5 million computers around the world inoperable (the "CrowdStrike Outage" or "Outage"). CrowdStrike's negligence in the course of developing, testing, and releasing the defective update triggered huge disruptions to critical sectors of the global economy, leaving businesses worldwide scrambling to restore critical IT systems.

The CrowdStrike Outage swept across the globe, affecting industries ranging from healthcare, to technology, to transportation. Certain airlines that had installed CrowdStrike's Falcon software on their computer systems were particularly hard hit, as the Outage crippled their internal IT networks, leaving travelers such as Plaintiffs to suffer the consequences of CrowdStrike's negligence. Through this action, Plaintiffs seek to redress CrowdStrike's failures and hold it accountable for causing a worldwide computer system outage.

In granting CrowdStrike's motion to dismiss, the District Court held Plaintiffs' claims were preempted under the Airline Deregulation Act of 1978 ("ADA"). That ruling was error. Plaintiffs' claims concern CrowdStrike's software

1

development, testing, and release practices, none of which are an airline service under the ADA as interpreted by this Court. Further, any connection between Plaintiffs' claims and airline rates, routes, or services is too attenuated to create the "forbidden significant effect" required for preemption to apply. The District Court's holding expands the scope of ADA preemption far beyond the statutory text and Congressional intent, and must be reversed.

The District Court also erred by considering whether Plaintiffs' claims would be preempted if asserted against an airline. No airline is a party to this action and the District Court's ruling impermissibly strayed beyond the facts of the case before it to find Plaintiffs' claims preempted. Such a hypothetical inquiry is not derived from or supported by Supreme Court or Fifth Circuit precedent. By relying on an improper and unsupported consideration to reach its decision, the District Court departed from controlling authority and committed an error warranting reversal.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal of an order and final judgment granting Defendants-Appellees CrowdStrike, Inc. and CrowdStrike Holdings, Inc.'s motion to dismiss and dismissing the claims of Plaintiffs-Appellants Julio del Rio, Jack Murphy, Steven Bixby, Alicia Kirby, Philip Kirby, Jennie Aguayo, Christopher Harlan, and Sara

Harlan (collectively, "Plaintiffs"). ROA.552-63; *Umbrella Inv. Grp. v. Wolters Kluwer Fin. Servs.*, 972 F.3d 710, 712 (5th Cir. 2020).

## ISSUES PRESENTED FOR REVIEW

1.     Whether claims alleging a software company negligently developed, tested, and released a defective update to cybersecurity software are related to or have a forbidden significant effect on airline services under the Airline Deregulation Act, 49 U.S.C. § 41713.

2.     Whether the District Court erred by analyzing whether Plaintiffs' claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713, as though Plaintiffs' claims were asserted against an airline when (a) no airline is a party to this action, and (b) neither Supreme Court nor Fifth Circuit precedent permits such an inquiry.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     CrowdStrike and the Falcon Cybersecurity Software

Defendants CrowdStrike, Inc. and CrowdStrike Holdings, Inc.,[1] form a cybersecurity firm that develops commercial data protection software designed to safeguard computer systems against cyberattacks and malware. ROA.313. CrowdStrike's cybersecurity software monitors large organizations' networks for

---

[1] CrowdStrike, Inc., is a wholly owned subsidiary of CrowdStrike Holdings, Inc. ROA.327.

potential threats and provides information to assist businesses' response. ROA.326. CrowdStrike licenses its cybersecurity software to commercial entities on a subscription basis while maintaining ownership of the software. ROA.328. CrowdStrike has over 29,000 subscribers globally, including hundreds of Fortune 500 companies spanning a diverse range of industries such as finance, healthcare, technology, and transportation. ROA.327.

CrowdStrike's primary product is its Falcon cybersecurity platform, which consists of two distinct parts: the Falcon Sensor and CrowdStrike's security cloud infrastructure. ROA.327-28. The Falcon Sensor is an endpoint detection and response program installed on each computer on a network. ROA.328. Once installed, Falcon uses "machine learning, AI, exploit blocking, and advanced behavioral techniques" to monitor the device for signs of suspicious activity, such as malware and cyberattacks. ROA.328-29.

Falcon is "like traditional antivirus software, but on steroids." ROA.329. CrowdStrike designed the Falcon Sensor to operate as "privileged software" with a high level of access to the sensitive internal systems of each computer. ROA.329. Specifically, CrowdStrike designed Falcon to operate at the "kernel" level of Microsoft Windows, which is the core component of Windows that manages a computer's hardware, processes, and memory. ROA.329. Designing software to operate at the kernel level entails inherent risks because any issues in the software

have the potential to impact the entire computer system. ROA.330. Plaintiffs alleged that due to this risk, developers whose software requires kernel-level access, like CrowdStrike, should "be held to a much higher quality assurance standard." ROA.330.

**B.** **CrowdStrike Negligently Developed and Released Defective Software**

CrowdStrike releases two types of updates for the Falcon Sensor: "sensor content," which enhances the Sensor's threat detection capabilities, and rapid response content updates, which direct the Falcon Sensor to observe, detect, or prevent specific behaviors without changes to its underlying code. ROA.331-32. Sensor content includes "template types," which control how the Sensor collects and processes data, while rapid response content includes "template instances," which provide specific data to the template types. ROA.332. Rapid response content updates are "dynamically delivered from the cloud" to the Falcon Sensor several times per day in response to newly discovered "tactics, techniques, and procedures." ROA.332.

**1.** **CrowdStrike Released a Defective Template Type**

On February 8, 2024, CrowdStrike released Falcon Sensor version 7.11, which introduced the "IPC Template Type," intended to address threats to a specific process in Windows computers. ROA.333. The IPC Template Type contained a defect that required the Sensor to provide 21 inputs, though CrowdStrike designed

the Sensor to provide only 20 values. ROA.333. CrowdStrike asserts the IPC Template Type was developed and tested according to its standard development processes, but admits the defect evaded detection during testing of the new Sensor version, testing of the IPC Template Type itself, and during development and release of rapid response content updates for that template in March and April, 2024. *See* ROA.333-34, 339. The rapid response content updates released in March and April, 2024, were programmed to accept "any value or no value at all" for the 21st input, so the mismatch between the amount of data the template expected and the amount of data the Sensor provided went undetected. *See* ROA.334.

### 2. CrowdStrike Released a Defective Rapid Response Content Update

As part of its standard development process, CrowdStrike uses a "content validator" program to check rapid response content updates before they are released. *See* ROA.334. However, the content validator itself contained a programming flaw that caused it to assume the Falcon Sensor would provide 21 inputs to the IPC Template Type, even though the Sensor was programmed to provide 20. ROA.334-35. As a result, the content validator did not discover the mismatched number of inputs in the IPC Template Type. CrowdStrike admits this defect in the content validator was a cause of the CrowdStrike Outage. ROA.335. Plaintiffs alleged that had CrowdStrike exercised ordinary care, it would have designed the content

validator to not approve mismatched input criteria, which would have revealed the defects that caused the Outage and prevented it from occurring. ROA.335.

On July 19, 2024, CrowdStrike released two new rapid response content updates for the defective template type. ROA.334. Both were approved by the faulty content validator, despite one of the updates containing problematic data. ROA.334, 341. Because the content validator approved the new updates, and given that CrowdStrike had released updates for the defective template type previously seemingly without issue, CrowdStrike did not conduct any additional tests of the July 19, 2024 updates prior to releasing them. ROA.340-42. Plaintiffs allege CrowdStrike was negligent in not conducting further tests of the updates before releasing them, and that doing so would have revealed the defects that caused the Outage. ROA.342-43.

Unlike earlier updates that tolerated a missing input, the defective July 19, 2024 update required the Sensor to provide 21 input values. ROA.340. The Sensor's attempt to generate the 21st value caused an "out-of-bounds memory read" error. ROA.335. At the time of the CrowdStrike Outage, CrowdStrike had not designed the Falcon Sensor to have any safeguards against out-of-bounds memory read errors, despite these errors being extremely common. ROA.336. The memory read error caused the Falcon Sensor to crash which, because the Sensor operates at the kernel

level, caused Windows to crash. CrowdStrike admitted this out-of-bounds memory read was a cause of the CrowdStrike Outage. ROA.336.

Compounding CrowdStrike's negligence in designing and testing Falcon software was its lack of care in the manner it released updates. CrowdStrike habitually pushed rapid response content updates to many customers at once in large-scale releases, and pushed the defective update to computers "regardless of any settings meant to prevent such automatic updates." ROA.343. Plaintiffs alleged CrowdStrike was negligent by failing to release updates in staged deployments because a gradual rollout would have revealed the defects that caused the Outage long before it reached millions of computers around the world.[2] *See* ROA.343-44. After the Outage, CrowdStrike admitted it should have been releasing rapid response content updates through staged deployment. ROA.344.

Plaintiffs further alleged that as a cybersecurity software company, CrowdStrike knew that failing to properly develop, test, and release software updates would cause widespread IT system outages, and that it was aware of the massive damage that would result. ROA.345, 347. This knowledge is evidenced by statements in CrowdStrike's SEC filings, in which it acknowledges the risk that its products may contain defects that would impact the Falcon platform. ROA.345. The

---

[2] Staged deployments involve "releasing updates to portions of the software's userbase at a time, rather than updating the software for all users at once." ROA.344.

Outage was also foreseeable because similar events have occurred in the recent past. ROA.348-49.

###    C.    The CrowdStrike Outage

As a result of the defects in CrowdStrike's Falcon software, Windows computers that received the defective update on July 19, 2024 became inoperable. ROA.314. The defects forced affected devices into a "recovery boot loop," repeatedly attempting to start, encountering the Sensor's memory read error, crashing, and then attempting to restart, only to repeat the cycle. *See* ROA.344. Impacted computers displayed a "blue screen of death," signaling a critical error causing the operating system to crash. ROA.344-45.

The defective update caused "a global tech disaster," disabling over 8,500,000 computers around the world. ROA.314, 350. Members of Congress's Homeland Security Committee, in a letter to CrowdStrike's CEO, confirmed the Outage had "major impacts to key functions of the global economy, including aviation, healthcare, banking, media, and emergency services." ROA.350. Exacerbating the damage was the fact that the update could not be easily reverted once an affected computer began crashing; IT personnel had to manually repair each affected computer one at a time. ROA.350-51.

Among the businesses most severely affected by the CrowdStrike Outage were airlines who used Falcon on their internal IT systems. ROA.314. As "one of

the largest global IT system outages in history," the CrowdStrike Outage unleashed cascading effects that affected Plaintiffs, who were each attempting to travel when the CrowdStrike Outage struck. ROA.314, 316-25. As Plaintiffs allege, these events "illustrate why it is absolutely critical that vendors supplying software updates or patches thoroughly test them to ensure that those updates are not causing harm or outages before they are deployed." ROA.349.

## II.    Procedural History

On August 5, 2024, Plaintiffs del Rio, Murphy, and Bixby filed a putative class action against CrowdStrike in the United States District Court for the Western District of Texas. ROA.18-44. On August 19, 2024, Plaintiffs Christopher Harlan and Sara Harlan filed a separate putative class action against CrowdStrike in the same court. ROA.592-624. On October 8, 2024, Plaintiffs in both actions moved to consolidate the related actions and appoint interim class counsel. ROA.174-96. CrowdStrike filed a response opposing consolidation beyond the pleading and discovery stages as premature and the appointment of interim leadership as unnecessary. *See* ROA.271-77. Plaintiffs filed a reply on October 18, 2024. ROA.281-89. The District Court granted Plaintiffs' motion, consolidating the cases and appointing interim class counsel on November 6, 2024. ROA.295-304.

Plaintiffs Julio del Rio, Jack Murphy, Steven Bixby, Alicia Kirby, Philip Kirby, Jennie Aguayo, Christopher Harlan, and Sara Harlan filed their Consolidated

Class Action Complaint (the "Complaint") on December 6, 2024. ROA.313-70. The Complaint asserted claims for negligence, negligent design, negligent failure to test, negligent failure to warn, and public nuisance on behalf of Plaintiffs and a class of individuals whose flights were delayed or cancelled as a result of the CrowdStrike Outage. ROA.352, 356-67. Plaintiffs also alleged state-specific subclasses for citizens of California, Ohio, Pennsylvania, Iowa, and Nevada. ROA.352-53.

CrowdStrike moved to dismiss the consolidated action on February 4, 2025. ROA.392. In its motion to dismiss, CrowdStrike asserted Plaintiffs' claims were preempted under the Airline Deregulation Act, the Complaint failed to identify which state's law applied, and that Plaintiffs failed to state a claim for negligence and public nuisance. ROA.398-99. CrowdStrike also moved the District Court to strike Plaintiffs' class allegations. *See* ROA.399.

Plaintiffs responded to CrowdStrike's motion to dismiss on April 7, 2025. ROA.460-94. In their response, Plaintiffs demonstrated their claims are not preempted because they do not relate to airlines services under the ADA and would not have a forbidden significant effect on airline services; that they were not required to allege which state's law applied in their Complaint; that striking the class allegations was premature; and that the Complaint adequately stated claims for negligence and public nuisance. ROA.460-94.

CrowdStrike filed its reply in support of the motion to dismiss on May 7, 2025. ROA.512-33. Plaintiffs then sought leave to file a surreply, ROA.534-36, which the District Court granted. *See* ROA.16 (text order entered on docket). Plaintiffs filed their surreply on June 4, 2025. ROA.545-48.

On June 18, 2025, the District Court entered an order granting CrowdStrike's motion to dismiss. ROA.552-62. The District Court held Plaintiffs' claims, which were premised on CrowdStrike's negligent failures in the development, testing, and release of updates for the Falcon cybersecurity platform, related to airline services within the meaning of the ADA and would have a forbidden significant effect on airline regulation. ROA.552-62.

The District Court entered a final judgment dismissing Plaintiffs' claims on June 18, 2025. ROA.563. Plaintiffs timely filed a notice of appeal on June 25, 2025. ROA.564-65.

### SUMMARY OF THE ARGUMENT

The District Court erred by holding the ADA preempts Plaintiffs' claims against CrowdStrike. The ADA is an economic deregulation statute designed to prevent states from imposing economic constraints on airlines. The ADA preempts only those claims which relate to, and have a significant economic effect on, airline rates, routes, or services. The ADA was never intended to displace traditional tort or

product liability claims that do not regulate airlines' conduct or have significant economic effects on airlines.

Here, Plaintiffs allege CrowdStrike negligently developed, tested, and released defective cybersecurity software updates, causing a global technology outage. These claims relate to CrowdStrike's conduct and duties as a software developer, not aspects of the contractual relationship between airlines and passengers. Enforcing duties of care on software developers does not create regulatory-like obligations on airlines or force airlines to alter their rates, routes, or services.

Because Plaintiffs' claims neither relate to nor have a forbidden significant effect on airlines' rates, routes, or services, they are not within the scope of claims Congress intended the ADA to preempt. The District Court's holding to the contrary is erroneous and must be reversed.

ARGUMENT

## I.     Standard of Review

The Court reviews a district court's grant of a motion to dismiss de novo and applies the same standard as the district court. *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513 (5th Cir. 2017). To survive a motion to dismiss under Rule 12(b)(6), plaintiffs "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d

191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). The Court accepts all well-pleaded facts as true and construes all reasonable inferences in the light most favorable to the plaintiffs. *Hernandez v. W. Tex. Treasures Estate Sales, LLC*, 79 F.4th 464, 469 (5th Cir. 2023). "Motions to dismiss are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

Questions of law regarding the preemptive effect of a federal statute are also reviewed de novo. *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 382 (5th Cir. 2004) (applying de novo standard in ADA preemption case). CrowdStrike, as the party asserting federal preemption, bears the burden of persuasion. *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017).

## II.    The District Court Erred by Holding the ADA Preempts Plaintiffs' Claims

### A.    Legal Standard for ADA Preemption

The ADA is an economic deregulation statute Congress enacted "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services." Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705; *see also* 49 U.S.C. § 40101(a)(6), (12). To prevent state interference with the goal of

economic deregulation, Congress included a preemption provision in the ADA. *Morales v. TWA*, 504 U.S. 374, 378, 112 S. Ct. 2031, 2034 (1992).

The ADA's preemption provision prohibits states from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."[3] 49 U.S.C. § 41713(b)(1). Determining the scope of preemption under the ADA is a question of statutory intent. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citing *Morales*, 504 U.S. at 383, 112 S. Ct. at 2036); *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260, 133 S. Ct. 1769, 1778 (2013) ("Where, as in this case, Congress has superseded state legislation by statute, our task is to 'identify the domain expressly preempted.'" (citation omitted)). Interpreting the language of the statute itself is key to determining whether preemption applies. *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335–36 (5th Cir. 1995) (en banc).

Considering the scope of preemption under the ADA for the first time in *Morales*, the Supreme Court held the phrase "related to" encompasses state laws "having a connection with, or reference to," an air carrier's prices, routes, or services.[4] *Morales*, 504 U.S. at 384, 112 S. Ct. at 2037. However, "the breadth of

---

[3] An "air carrier" is defined to include a corporation "undertaking by any means, directly or indirectly, to provide air transportation." *See* 49 U.S.C. § 40102(a)(2), (a)(15).

[4] "At the time of the *Morales* decision, this provision was codified at 49 U.S.C. § 1305(a)(1), but its language was functionally identical to that contained in its modern incarnation, § 41713." *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1254 n.5 (11th Cir. 2003); *see also Am. Airlines,*

the words 'related to' does not mean the sky is the limit." *See Dan's City Used Cars*, 569 U.S. at 260, 133 S. Ct. at 1778. The connection between a claim and an airline's rates, routes, or services "cannot be de minimis: the challenged law must have a 'forbidden significant effect' on prices, routes, or services in order to fall under the ADA's protective carapace." *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 454 (1st Cir. 2014) (quoting *Morales*, 504 U.S. at 388, 112 S. Ct. at 2039); *Air Evac EMS, Inc. v. Sullivan*, 8 F.4th 346, 351 (5th Cir. 2021). A claim with "too tenuous, remote, or peripheral" of a connection to airline rates, routes, or services is not preempted. *Morales*, 504 U.S. at 390, 112 S. Ct. at 2040.

## B.     Plaintiffs' Claims Do Not Relate to Airline Services

The ADA does not preempt Plaintiffs' claims because they concern CrowdStrike's software development practices, conduct unrelated to airline services. As interpreted by this Court, airline services are limited to the benefits passengers pay for, the functions airlines necessarily perform to provide those benefits, and amenities airlines customarily provide during air travel. The ADA preempts only those claims which directly implicate these core aspects of the contractual bargain between airlines and passengers. CrowdStrike's development, testing, and release of a defective cybersecurity software update bears no connection

---

*Inc. v. Wolens*, 513 U.S. 219, 223, 115 S. Ct. 817, 821 (1995) (noting "Congress intended the revision to make no substantive change").

to the contractual relationship between Plaintiffs and the airlines. Because Plaintiffs' claims arise from CrowdStrike's independent conduct in developing, testing, and releasing a defective software update, they do not relate to airline services, and the District Court erred by holding they are preempted by the ADA.

> ### 1.    A Service Under the ADA is Limited to Aspects of The Airline-Passenger Relationship

Neither the ADA nor *Morales* expressly defines the term service. This Court addressed its meaning in *Hodges*, holding services "generally represent a bargained-for or anticipated provision of labor from one party to another" and must be derived from the "contractual arrangement between the airline and the user of the service." *Hodges*, 44 F.3d at 336 (en banc). A service therefore reflects the contractual arrangement between an airline and its passengers, encompassing only those aspects of air transportation that are "appurtenant and necessarily included with the contract of carriage between the passenger . . . and the airline." *Id.*

Relevant aspects of the contractual relationship between airlines and passengers include "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself." *Id.* Passengers pay airlines to provide transportation. Airlines necessarily maintain ticketing and boarding procedures to ensure passengers have purchased tickets and can safely board and deplane. Passengers customarily expect airlines to handle checked luggage and provide some form of in-flight food or beverage. These features are therefore all

"appurtenant and necessarily included" in the contract of carriage between passengers and airlines. *Id.*; *Smith v. Am. W. Airlines*, 44 F.3d 344, 346–47 (5th Cir. 1995) ("[I]t is reasonable to interpret the 'service' of boarding to be limited to economic decisions concerning boarding, e.g., overbooking or charter arrangements, and contractual decisions whether to board particular ticketed passengers.").

The Court further emphasized that at the time of the ADA's enactment, service referred to "the point-to-point transportation of passengers, cargo or mail, and it encompassed the business of transportation as well as the schedules and type of contract (common carriage or charter)." *Hodges*, 44 F.3d at 337. The Court also noted the Federal Aviation Agency "continues to identify 'service' or 'services' in its regulations to incorporate the accoutrements of the passenger- or shipper- and carrier contract." *Id.*; *see also id.* at 337 n.6 (listing examples of service in airline regulations).

A service, as defined in *Hodges*, is necessarily a component of the contractual bargain between an airline and its passengers. The Eleventh Circuit adopted this definition in *Branche*, explaining services are "limited to the *bargained-for* aspects of airline operations over which carriers compete." 342 F.3d at 1257–58 (emphasis in original). As such, service encompasses benefits passengers expressly pay airlines to provide, functions necessary to deliver those benefits to passengers, and amenities customarily provided to passengers. *See Hodges*, 44 F.3d at 337 ("'services' includes

all aspects of the air carrier's 'utility' to its customers"); *Branche*, 342 F.3d at 1258–59 (service "includes not only the physical transportation of passengers, but also the incidents of that transportation over which air carriers compete"); *cf. Tobin*, 775 F.3d at 454 ("Package handling, address verification, and package delivery plainly concern the contractual arrangement between FedEx and the users of its services (those who send packages)."). CrowdStrike's software development, testing, and release processes clearly do not fall within this definition of airline service.

### 2.    Cybersecurity Software Development is Not an Aspect of the Airline-Passenger Relationship

CrowdStrike's negligent development, testing, and release of defective cybersecurity software lies entirely outside the scope of airline services under the ADA. The ADA does not shield CrowdStrike simply because some airlines use its product. Courts apply ADA preemption to claims against vendors who have a direct, active role in the airlines' provision of services to passengers. CrowdStrike develops and licenses a back-end cybersecurity platform some airlines utilize on their internal IT systems. It does not provide any service to airline passengers, let alone provide a service as narrowly defined by this Court in *Hodges*. CrowdStrike's independent conduct in developing, testing, and releasing updates for its Falcon platform does not entitle it to benefit from ADA preemption.

*Pica* and *In re American Airlines Privacy Litigation* illustrate why Plaintiffs' claims are not preempted. In *Pica*, the plaintiffs sued Delta and a third-party vendor

that provided "voice and chat services related to sales and support for Delta" after a data breach compromised their personal information. *Pica v. Delta Air Lines, Inc.*, No. CV 18-2876-MWF (Ex), 2019 U.S. Dist. LEXIS 65985, at \*3–6 (C.D. Cal. Feb. 14, 2019). The Court held the negligence claim against the vendor was preempted because the vendor's sales and support services were directly related to Delta's rates, routes, or services. *Id.* at \*27–28.

Similarly, *In re American Airlines Privacy Litigation*, the plaintiffs sued American Airlines, a vendor, and others for the wrongful disclosure of sensitive personal information. *See In re Am. Airlines, Inc., Priv. Litig.*, 370 F. Supp. 2d 552, 555 (N.D. Tex. 2005). The vendor maintained American's website, which customers used to purchase tickets, at which time American would collect their personal information. *Id.* at 555–56. The court held the plaintiffs' claims against the vendor were preempted because the information was obtained in the course of "taking reservations or selling air transportation," which was conduct covered by the ADA. *See id.* at 564–65.

In both cases, claims against the vendors were preempted because the vendors were directly involved in the airlines' provision of services to passengers, including sales and ticketing services, functions clearly within the scope of the ADA. *Pica*, 2019 U.S. Dist. LEXIS 65985, at \*28; *In re Am. Airlines*, 370 F. Supp. 2d at 564–65. In contrast, CrowdStrike does not provide or assist airlines in providing any

service to passengers. Its Falcon software is a back-end cybersecurity product designed to "monitor what is happening on the computers on which it is installed, looking for signs of nefarious activity (such as malware)" and "help to lock down the threat." ROA.328-29. The mere fact that certain airlines used CrowdStrike's software for cybersecurity purposes on some computers within their internal IT systems does not transform cybersecurity monitoring software into an airline service. Unlike the vendors in *Pica* and *In re American Airlines*, CrowdStrike plays no role in providing services to passengers.

The Northern District of Georgia's decision in *Bajra v. Delta Air Lines, Inc.*, No. 1:24-CV-3477-MHC, 2025 U.S. Dist. LEXIS 107473 (N.D. Ga. May 6, 2025), does not support preemption here. In *Bajra*, the plaintiffs brought common law and state consumer protection law claims against Delta for failing to adhere to its advertised reimbursement and refund policies after the CrowdStrike Outage. *See Bajra*, 2025 U.S. Dist. LEXIS 107473, at *14–24. The court concluded that plaintiffs' non-contractual claims were preempted because they concerned Delta's "advertisements and policies regarding reimbursements in the event of cancellations or delays," and as such were directly related to airline rates or services. *Id.* at *44. *Bajra* is unremarkable in light of the Supreme Court's decision in *Morales*, which made clear that the ADA preempts claims seeking to impose state-specific trade

21

practice laws on airline's advertising of prices or fares. *Morales*, 504 U.S. 374, 387–89, 112 S. Ct. 2031, 2039–40.

*Bajra* is readily distinguishable from this action. The claims in *Bajra* turned on the nature of the actions Delta took towards its passengers after the CrowdStrike Outage occurred. *See Bajra*, 2025 U.S. Dist. LEXIS 107473, at *44. In contrast, Plaintiffs' claims here are solely concerned with CrowdStrike's actions in causing the CrowdStrike Outage. While Plaintiffs allege they suffered various injuries as a result of the CrowdStrike Outage, they do not allege wrongful conduct on the part of any airline caused their injuries, nor do they allege that CrowdStrike participated or effected the provision of any airline service. *See* ROA.316-25; *Codoni v. Port of Seattle*, No. 2:23-cv-795-JNW, 2024 U.S. Dist. LEXIS 214318, at *29 (W.D. Wash. Nov. 25, 2024) (defendants were not entitled to a finding of preemption simply because plaintiffs' alleged facts related to airline routes because that was not sufficient to determine that the claims hinged on a preempted issue).

Plaintiffs' claims target CrowdStrike's independent actions in developing, testing, and releasing defective cybersecurity software updates. Unlike the vendors in *Pica* and *In re American Airlines*, CrowdStrike has no direct role in ticketing, reservations, boarding, baggage handling, or any other passenger-facing function that falls within the scope of a service under the ADA. And unlike *Bajra*, where the plaintiffs challenged Delta's policies and advertisements regarding refunds,

Plaintiffs here do not allege any wrongful conduct by an airline. The mere fact that some airlines used CrowdStrike's software does not convert cybersecurity software development into an airline service. Because Plaintiffs' claims do not hinge on airline rates, routes, or services, ADA preemption does not apply.

### C.    Plaintiffs' Claims Do Not Have a Forbidden Significant Effect on Airline Services

Even if Plaintiffs' claims could be construed as relating to an airline service (they cannot), preemption still would not apply because the claims plainly lack the "forbidden significant effect" on airline services required under the ADA. *Morales*, 504 U.S. at 388, 112 S. Ct. at 2039. The Supreme Court has made clear that claims affecting airline services only in a "tenuous, remote, or peripheral" manner are not preempted; preemption attaches only where they have a "'*significant* impact' on [airline] rates, routes, or services." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375, 128 S. Ct. 989, 998 (2008) (emphasis in original).

The "relevant inquiry is whether enforcement of the plaintiff's claims would impose some obligation on [the defendant] with respect to conduct that, when properly undertaken, is a service." *Tobin*, 775 F.3d at 454; *Bower v. EgyptAir Airlines Co.*, 731 F.3d 85, 96 (1st Cir. 2013) ("[T]he proper inquiry is whether a common law tort remedy frustrates deregulation by interfering with competition through public utility-style regulation. When state law does not have a regulatory effect, it is 'too tenuous, remote or peripheral' to be preempted." (quoting *Taj Mahal*

*Travel v. Delta Airlines*, 164 F.3d 186, 194 (3d Cir. 1998)). Courts consider "(1) the objectives of the [ADA] as a guide to the scope of the state law that Congress understood would survive, and (2) the nature of the effect of the state law on airline prices, routes, and services." *Day v. SkyWest Airlines*, 45 F.4th 1181, 1186 (10th Cir. 2022) (internal quotations omitted) (alteration in original). Applying these principles, the claims at issue here are far removed from the ADA's preemptive scope.

### 1.    Congress Did Not Intend to Preempt Claims Like Those Plaintiffs Assert Here

Plaintiffs' claims are not preempted because Congress never intended the ADA to apply to tort-based personal injury or product liability claims that do not have a significant economic effect on airlines. "The fundamental question in all cases of statutory construction is legislative intent and the reasons that prompted the legislature to enact the law." *In re Whitaker Constr. Co.*, 411 F.3d 197, 204 (5th Cir. 2005). There is no evidence Congress "intended to displace the application of state tort law to personal physical injury" claims. *Hodges*, 44 F.3d at 338. Nor is there evidence Congress intended the ADA to preempt product liability claims unrelated to airline rates, routes, or services. Rather, the ADA was intended to prevent states from frustrating the goal of deregulation by imposing economic controls on airlines.

The ADA is an "economic deregulation statute" enacted "to dismantle federal economic regulation" of the airline industry. *Id.* at 335. The Supreme Court has

repeatedly described the ADA's "overarching goal as helping ensure [airline] rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" *Rowe*, 552 U.S. at 371, 128 S. Ct. at 995 (quoting *Morales*, 504 U.S. at 378, 112 S. Ct. at 2034); *see also* 49 U.S.C. § 40101(a)(6), (12). Congress included the preemption provision to "prevent the states from frustrating the goals of deregulation by establishing or maintaining economic regulations of their own." *Hodges*, 44 F.3d at 335 (citing *Morales*, 504 U.S. at 378, 112 S. Ct. at 2034); *Taj Mahal Travel*, 164 F.3d at 191 ("To ensure that the states would not *re*-regulate what Congress had decided to *de*regulate, the [ADA] incorporated a preemption provision." (emphasis in original)).

Consistent with Congressional intent, this Court and others have recognized "the ADA was concerned solely with economic deregulation, not with displacing state tort law." *Hodges*, 44 F.3d at 337; *Day*, 45 F.4th at 1187 (collecting cases); *Taj Mahal Travel*, 164 F.3d at 194 ("focusing on the competitive forces of the market . . . leads to a more accurate assessment of Congressional intent"). As *Hodges* explained, "neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption." *Hodges*, 44 F.3d at 338. The Ninth Circuit has similarly concluded "that when Congress enacted

*federal* economic deregulation of the airlines, it intended to insulate the industry from possible *state* economic regulation as well. It intended to encourage the forces of competition. It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct." *Charas v. TWA*, 160 F.3d 1259, 1266 (9th Cir. 1998) (emphasis in original).

*Morales* illustrates the economic-centric nature of ADA preemption. There, the Supreme Court held the ADA preempted state advertising guidelines prohibiting deceptive airline fare advertisements. *Morales*, 504 U.S. at 391, 112 S. Ct. at 2041. The Court found that the advertising guidelines had "the forbidden significant effect" on airline rates because advertising inherently affected prices by driving competition and allowing airlines to attract price-sensitive passengers. *See id.* at 388–90. By burdening advertising, the regulations would significantly impact ticket prices, and were therefore preempted. *Id.* at 390.

In contrast to the economic regulations at issue in *Morales*, the ADA was never intended to preempt the "run-of-the-mill personal injury claims" Plaintiffs assert here. *Charas*, 160 F.3d at 1261; *Fenn v. Am. Airlines, Inc.*, 839 F. Supp. 1218, 1222 (S.D. Miss. 1993) ("This court . . . discerns in the ADA and its legislative history no sound basis for concluding that claims for bodily injury are *ipso facto* preempted." (italics in original)). Plaintiffs del Rio, Murphy, and Aguayo allege physical injuries resulting from the CrowdStrike Outage. ROA.316 (del Rio

"developed pain in his neck and back which lasted for several days" from sleeping on airport floor), 318 (Murphy developed a migraine due to sleep disruption), 323 (Aguayo "experienced anxiety, chest pains, and headaches due to the stress caused by the CrowdStrike Outage"). These are precisely the type of personal injury claims courts find fall outside the scope of the ADA.

For example, in *Butcher*, the plaintiff alleged an airline negligently failed to maintain the floors of an airport terminal, causing her to fall and suffer physical injuries. *Butcher v. City of Houston*, 813 F. Supp. 515, 517 (S.D. Tex. 1993). The court found the plaintiff's claims were not preempted, reasoning that "[t]he duty at common law to exercise ordinary care in the maintenance of floors in a terminal building . . . involves nothing that Congress appears either to have regulated or reserved for federal regulation." *Id.* at 518. Because Congress did not intend services under the ADA to include a general duty to maintain a terminal to avoid harming the public, the plaintiff's personal injury claims were not preempted. *Id.*; *accord Bower*, 731 F.3d at 96 ("[T]he ADA offers little reason to treat a passenger who slips and falls while deplaning differently than one who slips and falls in a restaurant.").

In *Hodges*, this Court held the ADA did not preempt a negligence claim arising from an airline's decision to stow a case of rum in an overhead bin, which later fell and injured the plaintiff. *Hodges*, 44 F.3d at 340. Although the plaintiff was injured during the airline's operation of the aircraft, the claim did not implicate or

have a significant effect on airline services. *Id.* The Court explained that claims seeking to enforce general tort duties "normally will not have 'the forbidden significant effect' on airlines' services." *Id.* at 339. Therefore, tort claims "can be enforced consistently with and distinctly from the services that Congress deregulated" under the ADA. *Id.*

The *Hodges* Court also found that Congress's requirement that airlines maintain liability insurance for bodily injury and property damage demonstrated personal injury claims were not completely preempted. *Id.* at 338; 49 U.S.C. § 41112. As this Court explained, "[i]n [§ 41713] Congress intended to prevent the states from regressing on economic deregulation by applying their own laws or rules concerning 'services,' but in [§ 41112], Congress explicitly preserved airlines' duty to respond to tort actions, inferentially state law actions, for physical injury or property damage." *Hodges*, 44 F.3d at 339. This insurance coverage mandate "can only be understood to qualify the scope of 'services' removed from state regulation" because reading the ADA to preempt all claims for personal injury "would have rendered any requirement of insurance coverage nugatory." *Id.* at 338; *Taj Mahal Travel*, 164 F.3d at 194 ("the continued existence of statutorily mandated liability

insurance coverage is strong evidence that Congress did not intend to preempt state tort claims").[5]

Other courts agree that simple tort claims alleging common-law duties of care are generally not preempted by the ADA. *E.g.*, *Charas*, 160 F.3d at 1261 (Congress did not intend the ADA to "immunize [defendants] from liability for personal injuries caused by their tortious conduct"); *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 321 (E.D. Mich. 1993) (negligence claim arising from luggage falling on passenger not preempted because "[a] state common law claim based on negligence and the standard of reasonable care does not purport to regulate the services that air carriers provide to their customers in exchange for their fares."); *Pittman by Pittman v. Grayson*, 869 F. Supp. 1065, 1072 (S.D.N.Y. 1994) ("actions in which plaintiffs invoke traditional elements of tort law [such as] suing for personal injuries sustained in airport terminals . . . overwhelmingly incline against federal preemption") (collecting cases); *Gill v. JetBlue Airways Corp.*, 836 F. Supp. 2d 33, 43 (D. Mass. 2011) (claims arising from injuries sustained when a passenger fell from a wheelchair while boarding a plane were not preempted as "[t]here is little reason to

---

[5] *See also United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (courts must construe statutes so that "no clause, sentence, or word shall be superfluous, void, or insignificant."); *Waggoner v. Gonzales*, 488 F.3d 632, 636 (5th Cir. 2007) (each part of a statute should be construed in connection with every other part to "to produce a harmonious whole.").

believe that the [preemption] clause was intended to extend to personal injury actions, which were not the subject of federal regulation in the first place").

Nor is there any indication Congress intended the ADA to preempt product liability claims such as Plaintiffs' negligent design, negligent failure to test, and negligent failure to warn claims where those claims do not relate to airline rates, routes, or services. The Eleventh Circuit has expressly held that negligence and product liability claims concerning a defectively designed airplane seat were not preempted under the ADA because they did not relate to airline routes, rates, or services. *Pub. Health Tr. v. Lake Aircraft, Inc.*, 992 F.2d 291, 295 (11th Cir. 1993). Similarly, the Tenth Circuit has found claims that an airplane was negligently designed did not fall within the ADA's preemptive reach. *See Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1444 n.13, 1447 (10th Cir. 1993). The claims in *Lake Aircraft* and *Cleveland* were directly related to aircraft, yet were still beyond the scope of rates, routes, and services under the ADA. Plaintiffs' product liability claims, which allege CrowdStrike breached duties of care in developing, testing, and releasing cybersecurity software updates, bear even less of a connection to airline rates, routes, and services than the claims in *Lake Aircraft* and *Cleveland*. *See* ROA.358-66. Congress could not have intended the ADA to reach product liability claims concerning back-end cybersecurity software and Plaintiffs' claims are not preempted.

Congress enacted the ADA to prevent state interference with economic deregulation of the airline industry. Congress never "intended for airlines' [or their vendors'] careless infliction of personal injuries on passengers to be governed solely by the whims of competitive market forces." *Day*, 45 F.4th at 1189 (internal quotations omitted). Nor is ADA preemption intended to shield airlines' vendors from liability for defective software products. Claims like those Plaintiffs assert here do not implicate market forces' effect on airlines rates, routes, and services, and so are not within the intended scope of preemption.

### 2. Plaintiffs' Claims Do Not Have a Forbidden Significant Effect on Airline Services

In finding Plaintiffs' claims were preempted, the District Court erroneously concluded the claims would have a significant economic effect on airlines. *See* ROA.559-61. The District Court found that enforcing state law duties of care on CrowdStrike would have significant, regulatory-like effects on airlines' prices or services because cybersecurity vendors may have an incentive to alter their practices and pricing specifically for their airline customers, which "would, in turn, have a significant effect on airline services and could also have an economic effect on airlines." ROA.560.

The District Court's speculative reasoning is not derived from facts alleged in the Complaint and is insufficient to find Plaintiffs' claims would have a significant economic effect on airlines' rate, routes, or services. The ADA preempts claims

"where the duty of care alleged drills into the core of an air carrier's services and liability for a breach of that duty could effect fundamental changes in the carrier's current or future service offerings." *Tobin*, 775 F.3d at 456. That imposing liability on CrowdStrike, a software company serving large companies in a wide variety of economic sectors, might indirectly cause cybersecurity vendors to alter their practices or increase prices for their airline customers, and that airlines could potentially respond by significantly altering the prices or services offered to passengers (rather than using another, less expensive cybersecurity platform), is too attenuated to satisfy this standard.

This conjecture relies on a chain of implausible inferences: (1) that CrowdStrike would raise its software prices based on potential airline passenger tort liability when CrowdStrike already faces tort liability through its other commercial customers (the vast majority of which have no immunity protections comparable to those in the ADA); (2) that airlines would continue using CrowdStrike's software rather than moving to cheaper alternatives from other vendors; and (3) that airlines would necessarily pass the cost of increased cybersecurity software to passengers, especially when cybersecurity software is a minor input cost. This is entirely implausible.

Plaintiffs' claims assert CrowdStrike violated common law duties of care as a software developer, not duties relating to airline rates, routes, or services. For

example, Plaintiffs' negligence claim alleges CrowdStrike's duties to "exercise reasonable care in maintaining, operating, and updating its software products," "detect and prevent the publication and dissemination of software or a software update containing serious flaws, errors, invalid data, or bugs," and "to ensure its software and software updates would not cause widespread computer network and IT system outages." ROA.356. Similarly, their negligent design and negligent failure to test claims assert CrowdStrike owed a duty to "act with reasonable care when designing, implementing, and maintaining its Falcon platform, including . . . when designing and implementing software updates." ROA.358-59, 361. Their negligent failure to warn claim alleges CrowdStrike's duty to warn customers of the risk of widespread computer outages stemming from its software designs and flawed development methods. *See* ROA.364. None of these duties are applicable to airlines, and imposing liability on CrowdStrike for breaching these duties would not affect airlines' rates, routes, or services.

In *Tobin*, the First Circuit found the plaintiffs' common law claims against FedEx for wrongfully mislabeling and delivering a package containing marijuana to plaintiff were preempted by the ADA because they would have a significant effect on defendant FedEx. *See Tobin*, 775 F.3d at 455. The court noted that plaintiff would have to prove "either that FedEx's procedures were inadequate or that those procedures, though adequate, were carried out carelessly by FedEx's employees."

*Id.* Finding FedEx's procedures were inadequate would significantly affect FedEx by requiring it to adopt new procedures for "labeling, verification, and delivery of packages," FedEx's "main business." *Id.* Finding FedEx's employees acted negligently would significantly affect FedEx by supplanting market forces with state-law standards governing how FedEx operates its core business of "package labeling, verification, and delivery." *See id.* 455–56. Thus, plaintiff succeeding on her claims would necessarily force FedEx to change how it provided services to its customers. *Id.*

In *Day*, the plaintiff sued defendant SkyWest Airlines for personal injuries she suffered after a flight attendant struck her with a beverage cart. *Day*, 45 F.4th at 1182. The Tenth Circuit held the plaintiff's claims were not preempted because the state negligence and contract laws at issue were "generally applicable background regulations that are several steps removed from prices, routes, or services." *See id.* at 1188 (citation omitted). The court reasoned the claims would not have a forbidden significant effect on airline rates, routes, or services because finding SkyWest liable "service would not force SkyWest to remove, add, or modify any of its prices, routes, or services; it would simply hold SkyWest to the same general obligations of due care . . . that apply to other companies." *Id.* at 1188–89. Preemption did not apply because the claims at issue did not "govern a central matter of an airline's prices, routes, or services," "interfere with uniform national policies regarding airline

prices, routes, or services," or "cause acute economic consequences that would effectively limit airlines' choices regarding their prices, routes, and services." *Id.* at 1190.

*Tobin* and *Day* illustrate that a claim has a forbidden significant effect on rates, routes, or services when imposing liability would compel airlines to alter core aspects of their rates, routes, or services for reasons other than market forces. *See Rowe*, 552 U.S. at 372, 128 S. Ct. at 995 (finding law preempted where it substituted state law requirements for competitive market forces in determining services offered). The claims in *Tobin* were preempted because they would impose duties of care controlling how FedEx conducted core aspects of its business, such that a ruling in plaintiff's favor would allow state law, rather than market forces, to govern deregulated aspects of FedEx's business. *See Tobin*, 775 F.3d at 456; *see also A.C.L. Computs. & Software, Inc. v. Fed. Express Corp.*, No. 15-cv-04202-HSG, 2016 U.S. Dist. LEXIS 29001, at *9 (N.D. Cal. Mar. 4, 2016) (negligence claim preempted because plaintiff sought to "require services significantly different than what the market might dictate"). The claims in *Day* were not preempted because they asserted general obligations to avoid causing foreseeable harm applicable to all companies, so finding SkyWest liable would "neither significantly determine what services airlines will provide nor require airlines to provide a service not available in the market." *Day*, 45 F.4th at 1191 (alterations adopted). Indeed, this Court has

recognized that enforcing state-law duties of care "normally will not have 'the forbidden significant effect' on airlines' services" required under *Morales*. *Hodges*, 44 F.3d at 339.

Plaintiffs' claims more closely resemble those found not preempted in *Day* than those held preempted in *Tobin*. Like the claims in *Day*, Plaintiffs' claims are premised on general duties of care that do not govern central matters of airlines' rates, routes, or services. Whether CrowdStrike violated duties to exercise reasonable care when developing, testing, and releasing software updates does not implicate airlines' rates, routes, or services at all, let alone "drill[] into the core of an air carrier's services." *Tobin*, 775 F.3d at 456. In contrast to the claims preempted in *Tobin*, Plaintiffs' claims would not result in state law governing airlines' decisions regarding ticketing, boarding procedures, provision of food and drink, baggage handling, or transportation according to market forces. Should Plaintiffs succeed, "the result of this action would be that [CrowdStrike] is prevented from engaging in the allegedly harmful behavior going forward, [but] all the central functions of the airline would still survive." *Emmett v. Delta Air Lines, Inc.*, No. 2:22-1568, 2024 U.S. Dist. LEXIS 97812, at *33 (W.D. Pa. June 3, 2024). Because the outcome of this action will not "impos[e] a fundamentally new set of obligations on airlines under the rubric of 'duty of care,'" Plaintiffs' claims are not preempted. *Bower*, 731 F.3d at 96.

The District Court erred in speculating that Plaintiffs' claims would significantly affect airlines services by ignoring facts alleged in the Complaint and failing to draw all reasonable inferences in Plaintiffs' favor. *Hernandez*, 79 F.4th at 469. The District Court found cybersecurity vendors might be incentivized to change their services, and consequently raise prices, for airlines. ROA.560. But Plaintiffs allege CrowdStrike's Falcon software is used by over 29,000 subscribers across industries such as finance, healthcare, and technology, in addition to transportation. ROA.327. Airlines are only a small fraction of CrowdStrike's customer base, making it unreasonable to infer CrowdStrike or other cybersecurity vendors would adopt special practices or prices solely for airlines.

The District Court also disregarded allegations that CrowdStrike has already changed its software development processes in response to the CrowdStrike Outage. Plaintiffs allege CrowdStrike addressed a defect in its content validator program, ROA.335, added features to prevent out-of-bounds memory reads, ROA.336, and implemented additional software testing procedures in the wake of the Outage. ROA.340, 342. Taking these allegations as true, it was unreasonable for the District Court to conclude Plaintiffs' claims would induce cybersecurity vendors to alter their practices, let alone have a significant effect on airlines. *See* ROA.560.

Further, the Complaint contains no allegations suggesting these changes were directed at airlines or that CrowdStrike would increase Falcon's price for airlines.

Nor are there any facts indicating airlines would (voluntarily or by necessity) alter their own rates or services in response. Even if Plaintiffs' claims incentivize CrowdStrike to raise prices, a change in the price of a vendor's cybersecurity software is not a significant effect on *airlines'* rates, routes, or services. *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 89 (1st Cir. 2011) (Rejecting the view that "state regulation is preempted wherever it imposes costs on airlines and therefore affects fares because costs 'must be made up elsewhere, *i.e.*, other prices raised or charges imposed.'"); *Day*, 45 F.4th at 1188 n.5 (preemption concerns are limited to "the acute effects of a finding of liability based on a particular cause of action, not the peripheral economic effects"). And even assuming *arguendo* that airlines alter their prices in response to increased cybersecurity software costs, such an indirect consequence is too remote or peripheral to "undermine the pro-competitive purpose of the ADA." *Day*, 45 F.4th at 1190 (quoting *Branche*, 342 F.3d at 1258); *see also S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012) (explaining laws governing inputs such as labor, capital, and technology affect prices but are to remote from the provision of services to be preempted under analogous law).

The District Court erred in finding Plaintiffs' claims would have a significant effect on airlines' rates, routes, and services because Plaintiffs' claims do not relate to any core aspects of airlines' business. The general duties of care alleged in the

Complaint do not "significantly impact the contractual service relationship between the air carrier and its customers." *Watson v. Air Methods Corp.*, 870 F.3d 812, 818 (8th Cir. 2017). As a result, any effect the claims have on airlines' rates, routes, or services "is both indirect *and* too remote or insignificant to warrant pre-emption." *Id.* (emphasis in original).

Because Plaintiffs' claims relate only to CrowdStrike's duties as a software developer and do not seek to regulate the core of airlines' rates, routes, or services, they do not have the forbidden significant effect required to be preempted under the ADA. The District Court's contrary holding erroneously relied on speculative, unfavorable inferences and impermissibly disregarded allegations in the Complaint. Plaintiffs' effort to hold CrowdStrike accountable to general duties of care does not impose obligations on air carriers, and any potential effect on airlines' rates, routes, or services are far too attenuated for preemption to apply. The District Court's ruling should be reversed.

### D.     The District Court Erred by Considering Whether Hypothetical Claims Against Non-Party Airlines Would be Preempted

The District Court erred by holding "Plaintiffs' claims concern the services they received from their respective airlines" because "their suit would be preempted if brought against the airlines directly." ROA.557.

Binding Supreme Court and Fifth Circuit authority is clear: a claim is preempted when it references or has a connection with airline rates, routes, or

services, such that enforcing the claim would have a forbidden significant effect on rates, routes, or services. *Morales*, 504 U.S. at 384, 388, 112 S. Ct. at 2037, 2039; *Wolens*, 513 U.S. at 224, 238, 115 S. Ct. at 822, 828; *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283–84, 134 S. Ct. 1422, 1430 (2014); *Hodges*, 44 F.3d at 336; *Onoh v. Nw. Airlines, Inc.*, 613 F.3d 596, 599 (5th Cir. 2010) ("Any state law, including state common law, having a connection with or reference to airline prices, routes, or services is preempted unless the connection or reference is too tenuous, remote, or peripheral." (internal quotations omitted)); *Lyn-Lea Travel Corp.*, 283 F.3d at 286–87; *accord Tobin*, 775 F.3d at 454 ("[T]he relevant inquiry is whether enforcement of the plaintiff's claims would impose some obligation on [the defendant] with respect to conduct that, when properly undertaken, is a service."); *Smith v. Comair, Inc.*, 134 F.3d 254, 257 (4th Cir. 1998); *Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996) (Supreme Court precedent establishes "two distinct requirements for a law to be expressly preempted by the ADA: (1) A state must 'enact or enforce' a law that (2) 'relates to' airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them."); *Watson*, 870 F.3d at 817; *Day*, 45 F.4th R 1186.

This Court has held "[t]he real question [under the ADA] is the scope of 'services' that were deregulated." *Smith*, 44 F.3d at 347. Plaintiffs' claims relate to CrowdStrike's negligent development, testing, and release of a defective software

update. ROA.315. The issue before the District Court therefore was whether CrowdStrike's software development, testing, and release practices are airline services under the ADA. To resolve that question, the District Court should have assessed whether those claims relate to or have a connection with airline services, and whether the claims have a forbidden significant effect on airline services or whether the claims' connection to airline services is too remote or tenuous for preemption to apply. *E.g.*, *Morales*, 504 U.S. at 384, 388, 112 S. Ct. at 2037, 2039; *Smith*, 44 F.3d at 347; *see also Day*, 45 F.4th at 1186 (setting out factors for courts to consider).

Rather than limiting its analysis to the appropriate standard set out by the Supreme Court and the Fifth Circuit, however, the District Court speculated whether the ADA would preempt claims based on "flight delays and cancellations and the failure of airlines to adequately reschedule or compensate for them" if brought against the airlines. ROA.556-57. This was error because the possibility that similar claims might be preempted if brought against an airline is not a relevant consideration in determining the scope of ADA preemption. The ADA preemption analysis is limited to the claims and facts before the court, not hypothetical claims against entities not party to the action. *Travel All Over the World*, 73 F.3d at 1433 (*Morales* "does not permit us to develop broad rules . . . . Instead, we must examine the underlying facts of each case to determine whether the particular claims at issue

'relate to' airline rates, routes or services."); *Tobin*, 775 F.3d at 456 (The *Morales* "framework calls for an individualized assessment of the facts underlying each case to determine whether a particular state-law claim will have a forbidden effect."); *Rombom v. United Air Lines*, 867 F. Supp. 214, 221 (S.D.N.Y. 1994) (Sotomayor, J.) ("Whether or not a claim is preempted under [the ADA] requires a careful, case-by-case analysis.").

The preemptive effect of the ADA on hypothetical claims against airlines who are not parties to this litigation has no bearing on whether the ADA preempts Plaintiffs' claims against CrowdStrike. The District Court's reliance on an irrelevant factor not derived from Supreme Court or Fifth Circuit precedent was an error warranting reversal. *See Garrett v. Lumpkin*, 96 F.4th 896, 901 (5th Cir. 2024) ("[W]here the district court applies the wrong legal standard, it is proper to remand to the district court with instructions to apply the correct legal standard."); *Klick v. Cenikor Found.*, 94 F.4th 362, 373–74 (5th Cir. 2023) (ordering remand where district court applied the incorrect legal standard); *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993) (reversing judgment of Court of Appeals where district court's application of incorrect standards "may well have influenced its ultimate conclusion"); *see also In re Chamber of Commerce of United States*, 105 F.4th 297, 300 (5th Cir. 2024) (granting mandamus where district court "misapplied the controlling [28 U.S.C. § 1404(a)] standard for transferring cases (and our

precedent applying that standard)"); *Guevara v. Castro*, 139 F.4th 422, 431 (5th Cir. 2025) ("[W]e evaluate whether the district court properly applied the law . . . to the facts before it.").

The District Court erred by departing from the governing preemption framework as set out by the Supreme Court and this Court by relying on analysis of hypothetical claims against non-parties. By relying on an irrelevant and legally unsound inquiry instead of applying the correct, settled standard, the District Court committed error warranting reversal.

## Conclusion

For the foregoing reasons, Plaintiffs-Appellants respectfully request that the Court reverse the order of the United States District Court for the Western District of Texas granting Defendants-Appellees' motion to dismiss, vacate the judgment in favor of Defendants-Appellees, and remand this action for further proceedings.

Date: September 3, 2025                Respectfully submitted,

                                       /s/ Ben Barnow
                                       Ben Barnow
                                       BARNOW AND ASSOCIATES, P.C.
                                       205 West Randolph Street, Ste. 1630
                                       Chicago, IL 60606
                                       Tel: 312-621-2000
                                       Fax: 312-641-5504
                                       b.barnow@barnowlaw.com

                                       Robert K. Shelquist
                                       CUNEO GILBERT & LaDUCA, LLP

5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Tel: 612.254.7288
rshelquist@cuneolaw.com

Cory S. Fein
CORY FEIN LAW FIRM
13105 Northwest Fwy., Suite 705
Houston, TX 77040
Tel.: 713-730-5001
Fax: 530-748-0601
cory@coryfeinlaw.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Ben Barnow, hereby certify that the foregoing document was caused to be served on counsel for Defendants-Appellees through the Court's electronic filing system this 3rd day of September, 2025.

/s/ Ben Barnow
Ben Barnow

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I, Ben Barnow, hereby certify that the foregoing document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,850 words. I also certify that the foregoing document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14, Times New Roman font.

/s/ Ben Barnow
Ben Barnow

*Counsel for Plaintiffs-Appellants*

Dated: September 3, 2025